[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 04-12976
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 12, 2005
THOMAS K. KAHN
CLERK

D. C. Docket No. 02-01702-CV-GET-1

ALAN I. BEGNER,
CORY BEGNER,

Plaintiffs-Appellants,

versus

UNITED STATES OF AMERICA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(August 12, 2005)**

Before EDMONDSON, Chief Judge, TJOFLAT and KRAVITCH, Circuit Judges.

TJOFLAT, Circuit Judge:

This case is about two taxpayers' Offer in Compromise (OIC), which is a contract between a taxpayer and the Internal Revenue Service in which the IRS agrees to accept an amount different from what the taxpayer owes in taxes. Specifically, the case is about whether the OIC permits the taxpayers to deduct amounts that they paid under a separate agreement that they had with the IRS. The taxpayers deducted the amount. The IRS objected, on the grounds that the deduction violated the terms of the OIC. The district court agreed with the IRS and granted the IRS's motion for summary judgment. We also agree with the IRS, and thus affirm.

To explain our reasoning, we divide this opinion into three parts. In Part I, we detail the facts. In part II, we apply the law—both jurisdictional and contract law—to these facts. In part III, we briefly conclude.

I.

The taxpayers are Alan Begner and his wife, Cory Begner. They owed three types of back taxes: (1) employment taxes from 1984-1990, (2) unemployment taxes from 1983-1991, and (3) income taxes from 1984-1987.

The Begners could not pay these back taxes and did not want to file for bankruptcy, so they each sought an OIC by submitting Form 656 to the IRS under

2

26 U.S.C. § 7122.[1]  Alan sought a release from liability by offering to pay

$100,000; Cory, $30,000.  Item 2 on Form 656 was for the Begners' social

security numbers.  Item 5 was for the amounts the Begners offered to pay.  A prior

version of Form 656, however,  required the Begners to list the amounts that they

were offering to pay in item 2.  This lurking discrepancy—one version of Form

656 requiring social security numbers in item 2, another requiring the amount

offered—created the dispute between the Begners and the IRS.

To release the Begners from their tax liability, the IRS wanted more than

just the OIC: as a form of additional consideration, the IRS required the Begners

to sign a Collateral Agreement.[2]  The Agreement required that in addition to the

$100,000 and $30,000, the Begners would "pay out of annual income for the years

1997 to 2001" the following amounts:

(a) Nothing on the first $144,000.00 of annual income[;]
(b) 30% of annual income more than $144,000.00 and not more than $154,000.00[;]
(c) 50% of annual income more than $154,001.00 and not more than $164,000.00[; and]
(d) 70% of annual income more than $164,001.00[.]

The Begners agreed.  The lurking discrepancy in the Begners' OIC resulted from

_____

[1]Although Alan and Cory Begner submitted separate OIC's, because they did so on identical forms, we treat their two OIC's as one OIC.

[2]Although Alan and Cory Begner signed separate Collateral Agreements, because they did so on identical forms, we treat their two Collateral Agreements as one Collateral Agreement.

3

the Collateral Agreement's definition of "annual income":

> [T]he term annual income . . . means adjusted gross income as defined in section 62 of the Internal Revenue Code (except losses from sales or exchanges of property shall not be allowed), plus all nontaxable income and profits or gains from any source whatsoever (including the fair market value of gifts, bequests, devises and inheritances), minus (a) the Federal income tax paid for the year for which annual income is being computed, and (b) any payment made under the terms of the offer in compromise (Form 656), as shown in item 2, for the year in which such payment is made.

(emphasis added). To put it simply, the Collateral Agreement referred to "any payment made under" the OIC "as shown in item 2," but the Begners' item 2 was their social security numbers. This was a mistake, but one that no one noticed at the time the Begners signed the Collateral Agreement.

For the next few years, the Begners paid amounts that they thought were required by their Collateral Agreement. The district court described these years:

> In tax year 1997, plaintiffs reported on their income tax return an adjusted gross income (AGI) of $225,764.00, and paid income tax of $56,628.00. Under the collateral agreement, plaintiffs reported their "annual income" as $169,136.00 (adjusted gross income minus income tax paid). This calculation resulted in a collateral agreement payment of $11,595.00.

> For tax year 1998, plaintiffs reported on their income tax return an AGI of $278,622.00, and paid income tax of $70,534.00. Under the collateral agreement, plaintiffs reported their "annual income" as $196,493.00. Plaintiffs reached this amount by deducting from their AGI income tax paid ($70,534.00) and the collateral agreement payment made the previous year ($11,595.00). This calculation led to

4

a collateral agreement payment of $30,745.00.

> For tax year 1999, plaintiff computed their "annual income" in a similar fashion. On their income tax return, plaintiffs reported an AGI of $272,629.00, and paid tax of $63,158.00. Plaintiffs calculated their "annual income" of $178,726.00 by subtracting from their AGI both the amount of income tax paid ($63,158.00) and the collateral agreement payment from the previous year ($30,745.00), resulting in a collateral agreement payment of $18,309.00.

Begner v. United States, No. Civ.A.1:02CV1702GET, 2004 WL 1386333, at *3 (N.D. Ga. Apr. 15, 2004). During these years, neither the Begners nor the IRS noticed the still-lurking discrepancy. The Begners also did not seem to notice Form 3439, which they signed for the years 1997-1999. Form 3439 explicitly stated that Collateral Agreement payments cannot be deducted.

After Cory sent the IRS a letter requesting hardship relief for an illness from which she suffered, the IRS discovered the discrepancy concerning item 2. In a letter to the Begners, the IRS wrote, "You cannot deduct payments made, in prior years, according to the Future Income Collateral Agreement, against Adjusted Gross Income." The IRS recomputed the Begners' liability to determine that they should have paid an additional $31,884.84. The IRS then wrote that the Begners were in default, and thus needed to pay the $31,844.84 if they wanted "to keep [their] Offers in force." The Begners acquiesced, paying the IRS $31,844.84.

The Begners then filed an action to recover the $31,844.84 (plus interest)

5

under 28 U.S.C. §§ 1340 and 1346.[3]  The Begners and the IRS filed cross-motions for summary judgment.  The district court rejected the IRS's argument that the court did not have jurisdiction.  The court then granted the IRS's motion for summary judgment, holding that the Begners "incorrectly deducted their past collateral agreement payments from their AGI when computing their 'annual income' under the term of their compromise with the IRS."  Begner, 2004 WL 1386333 at *5.  The Begners appealed.

## II.

"[W]e review a district court's grant of a motion of summary judgment de novo."  Cuvillier v. Rockdale County, 390 F.3d 1336, 1338 (11th Cir. 2004).  All issues of material fact are resolved in favor of the non-moving party.  Id.

There are two issues on appeal: (1) whether the district court had jurisdiction to hear the case, and (2) whether the terms of the Begners' OIC and Collateral Agreement permit them to deduct their previous year's Collateral Agreement payments.  Like the district court, we answer the first question in the affirmative and the second question in the negative.

---

[3] We discuss section 1346 in Part II.A.  Section 1340 provides that "[t]he district courts shall have original jurisdiction of any civil action arising under any Act of Congress providing for internal revenue, or revenue from imports or tonnage except matters within the jurisdiction of the Court of International Trade."  We do not focus on section 1340 because it, unlike section 1346, does not explicitly waive sovereign immunity.

A.

There are two statutory players in determining jurisdiction in the instant case: the Tucker Act, 28 U.S.C. § 1491(a)(1), and the tax-refund statute, 28 U.S.C. § 1346(a)(1).

The IRS bases its argument on the Tucker Act, which provides that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Under the Tucker Act, the Court of Federal Claims has exclusive jurisdiction for contracts in excess of $10,000. Friedman v. United States, 391 F.3d 1313, 1315 (11th Cir. 2004) (citing Mark Dunning Indus., Inc. v. Cheney, 934 F.2d 266, 269 (11th Cir. 1991)).[4] The IRS argues that, under the Tucker Act, "the District Court lacked jurisdiction because this case involves a claim for more than $10,000 that is founded on a contract with the United States and therefore is within the exclusive jurisdiction of the Court of Federal Claims." The IRS requests that we remand this case to the district court for transfer under 28 U.S.C. § 1631 to the Court of Federal Claims.

_____

[4] The Tucker Act has a sibling, known as the Little Tucker Act, 28 U.S.C. § 1346(a)(2), which "grants concurrent jurisdiction to both U.S. district courts and the Court of Federal Claims for contractual claims against the United States not exceeding $10,000." Roberts v. United States, 242 F.3d 1065, 1067-68 (Fed. Cir. 2001). Because the OIC in this case was for $31,844.84, we only need to address the Tucker Act.

7

Unlike the IRS's focus on the Tucker Act, the Begners focus on section 1346(a)(1), the tax-refund statute. The Begners rely on section 1346(a)(1) because without it, the United States, as a sovereign, could not be sued. F.D.I.C. v. Meyer, 510 U.S. 471, 475, 114 S. Ct. 996, 1000, 127 L. Ed. 2d 308 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."). Under section 1346(a)(1), however, the United States explicitly waives sovereign immunity for cases falling within the statute's reach. Mutual Assurance, Inc. v. United States, 56 F.3d 1353, 1355 (11th Cir. 1995) (citing section 1346(a)(1) and stating that "[t]he United States has waived its sovereign immunity in order to allow taxpayers to file actions seeking tax refunds").

The jurisdiction issue is thus simple: are the Begners and the district court correct that this is a tax-refund case under section 1346(a)(1), or is it a contract case under the Tucker Act? If it is the former, we have jurisdiction; if it is the latter, we do not.

In addressing this issue, courts look past the form of the action and determine whether the claim is, "at its essence," a contract or a tax-refund case. Megapulse, Inc. v. Lewis, 672 F.2d 959, 968 (D.C. Cir. 1982) ("The classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claims,

8

and upon the type of relief sought (or appropriate).”); see also Friedman, 391 F.3d

at 1315 (citing Megapulse for the rule that “[a] plaintiff cannot avoid the

jurisdictional limitations of the Tucker Act . . . by artful pleading”); Up State Fed.

Credit Union v. Walker, 198 F.3d 372, 376 (2d Cir. 1999) (“[T]he two-pronged

formation of Megapulse, which examines both the source of the rights at issue and

the nature of the remedy sought, builds logically on the analysis this Circuit has

developed to assess jurisdiction in the related context of the government contracts

process.”); North Star Alaska v. United States, 14 F.3d 36, 37 (9th Cir. 1994)

(quoting Megapulse).

We must determine whether the Begners’ claim is at its essence a contract

or a tax-refund case. To do this, we need to define exactly what constitutes a tax-

refund case. The statute’s language is broad, using the word “any” five times:

> Any civil action against the United States for recovery of any
> internal-revenue tax alleged to have been erroneously or illegally
> assessed or collected, or any penalty claimed to have been collected
> without authority or any sum alleged to have been excessive or in any
> manner wrongfully collected under the internal-revenue laws . . . .

28 U.S.C. § 1346(a)(1); see also United States v. Williams, 514 U.S. 527, 529, 115

S. Ct. 1611, 1614, 131 L. Ed. 2d 608 (1995) (stating that section 1346(a)(1)

contains “broad language,” which the Court then applied to a person who paid a

tax “even though the tax she paid was assessed against a third party”). Under the

9

terms of this statute, if the Begners paid the IRS "any sum alleged to have been . . . in any manner wrongfully collected under the internal-revenue laws," then their case is a tax-refund case.

If we rely on the plain language of section 1346(a)(1), this case is easy. The Begners deducted their Collateral Agreement payments from the previous year when computing their current Collateral Agreement liability. The IRS said that this violated the terms of its agreement with the Begners, and it determined the full amount that the Begners should have paid. The IRS said that if the Begners did not pay this full amount (i.e., the $31,844.84), they would default on their OIC. The Begners paid, and then filed an action seeking to recover the $31,844.84 (plus interest). Reducing the above facts to their essence, here is what happened: the Begners deducted amounts from their payments to the IRS that the IRS thought the Begners could not deduct, the IRS collected those amounts from the Begners, and the Begners consequently sued the IRS for a refund. The broad, plain language of section 1346(a)(1) encompasses this scenario.

No case is directly on point, but there are several cases that are sufficiently similar to be useful. The most important case, and the one on which the district court relied, is Roberts v. United States, 242 F.3d 1065 (Fed. Cir. 2001). In Roberts, the IRS and a taxpayer entered into an OIC resolving liability for back

10

taxes. Id. at 1066-67. The IRS "accused [the taxpayer] of violating the terms of the OIC," so it terminated the OIC, "making [the taxpayer] liable for his unpaid federal tax liability." Id. at 1067. The taxpayer paid all of his back taxes and filed a tax-refund case. Id. The Federal Circuit stated that "[t]ax cases heard in the district courts often involve offers in compromise." Id. at 1069. It then emphasized that "[t]he fact that the alleged collection error stems from the cancellation of [taxpayer's] OIC contract with the IRS does not negate the fact that the monies were paid pursuant to the internal-revenue laws." Id. The Federal Circuit then held—stressing the broad language of section 1346(a)(1)—that this situation is at its essence at tax-refund case and not a contract action. Id. While similar, our case is not hand-in-glove because in Roberts the IRS terminated the OIC, whereas here the OIC was still in effect. Roberts is still important, however, for its reminder that even though the issues in a case may focus on the contractual terms of an OIC, such a focus does not remove that case from section 1346(a)(1).

Another useful case is Wilkens v. United States, No. 03-Civ.-1837, 2004 U.S. Dist. LEXIS 8079 (D.N.J. Feb. 19, 2004). In Wilkens, two taxpayers entered into Offers in Compromise to settle tax liability, and "[u]nder the terms of the Offers in Compromise, [the taxpayers] agreed to make certain payments and to enter into a future income collateral agreement." Id. at *1. The taxpayers abided

11

by their OIC for a few years, but they and the IRS soon disputed the meaning of a term in their OIC. Id. at *2. To resolve that dispute, the taxpayers filed a declaratory-judgment action. Id. at *3. While the district court focused on different rules than those at issue here, the court also focused on Roberts, reaching a similar conclusion:

> In this case, as in Roberts, the true nature of the suit is not contractual. While [taxpayers] dispute the amount owed . . . under the Offers in Compromise, the Offers in Compromise reflect an agreement concerning monies ultimately due and owing as a result of the internal revenue laws.

Id. at *8; cf. Robinette v. Commissioner, 123 T.C. 85, 108 (2004) (citing Roberts and focusing on the source of the underlying dispute (i.e., the Commissioner's abuse of discretion), and not on the mere existence of an OIC).

These same principles apply here. True, the dispute is about how the OIC defines "annual income." In computing their Collateral Agreement payments for 1998 and 1999, the Begners deducted the Collateral Agreement payments they made in the previous years. That this case is a dispute about contract interpretation, however, "does not negate the fact that the monies at issues were paid pursuant to the internal-revenue laws." Roberts, 242 F.3d at 1069. As we stated before, this case is easy when based on a plain reading: the IRS collected sums from the Begners that they thought were wrongfully collected. These facts

12

satisfy what section 1346(a)(1) demands to constitute a tax-refund case.

The IRS cannot rebut this plain reading. It tries by making several iterations of the same argument: because the Begners' claims are based on the terms of their OIC and Collateral Agreement with the IRS, and because contract law governs, this case is at its essence a contract case. As stated above, however, that the case turns on an interpretation of a contract does not take it out of the reach of section 1346(a)(1). As such, we have jurisdiction to hear this case.

## B.

An OIC is a contract between a taxpayer and the IRS in which the IRS agrees to accept a payment different from what the taxpayer owes. Traditional rules of contract law apply to an OIC. United States v. Lane, 303 F.2d 1, 4 (5th Cir. 1962) ("It has long been settled that an agreement compromising unpaid taxes is a contract and, consequently, that it is governed by the rules applicable to contracts generally."). The Commissioner of the IRS has the authority to reach an OIC or other compromise agreement in any case "arising under the internal-revenue laws." 26 U.S.C. § 7122(a). A collateral agreement often adds further consideration for an OIC. E.g., Finen v. Commissioner, 41 T.C. 557, 560 (1964). Together, the OIC (Form 656) and the Collateral Agreement (Form 2261) comprise the contract at issue in this case.

Federal courts use federal common law to evaluate government contracts. Falls Riverway Realty v. City of Niagra Falls, 754 F.2d 49, 55 n.4 (2d Cir. 1985) (citing Priebe & Sons v. United States, 332 U.S. 407, 68 S. Ct. 123, 92 L. Ed. 32 (1947)); see also W. Sec. Co. v. Derwinski, 937 F.2d 1276, 1280 (7th Cir. 1991) ("Suits to enforce contracts with federal agencies are governed by federal common law . . . ."). When "determining what particular doctrine to apply in a particular suit, [however,] the court will often select a rule of state law." Derwinski, 937 F.2d at 1280 (citing United States v. Yazell, 382 U.S. 341, 86 S. Ct. 500, 15 L. Ed. 2d 404 (1966)); see also United States v. Pappas, 94 F.3d 795, 801 (2d Cir. 1996) (stating that "applicable general principles of state law" can inform federal common law). Here, we rely in part on Georgia contract law because most of the events occurred in Georgia.

Under Georgia law, courts examine a contract in its entirety in order to interpret any part thereof. Ga. Code Ann. § 13-2-2(4). Specifically, courts follow a three-step process in examining contracts:

> At least initially, construction is a matter of law for the court. First, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of

14

what the ambiguous language means and what the parties intended must be resolved by [the trier of fact].

Eudy v. Universal Wrestling Corp., 611 S.E.2d 770, 773 (Ga. Ct. App. 2005) (quoting Schwartz v. Harris Waste Mgmt. Group, 516 S.E. 2d 371, 375 (Ga. Ct. App. 1999)).

To move beyond the first step, we must decide that the contract is ambiguous. Whether or not a contract is ambiguous is a question of law for the court. Ga. Code Ann. § 13-2-1; Techwerks v. Retail Tech. Corp., 509 S.E.2d 84, 85 (Ga. Ct. App. 1998). A contract is ambiguous if it contains a "duplicity, indistinctness, an uncertainty of meaning or expression" that makes it susceptible to several reasonable interpretations. Holcim (US), Inc. v. AMDG, Inc., 596 S.E.2d 197, 200 (Ga. Ct. App. 2004) (quoting Early v. Kent, 108 S.E.2d 708, 709 (Ga. 1959)). A contract that is difficult to construe is not ambiguous unless the rules of contract interpretation do not resolve which of several possible interpretations represent the true intent of the parties. F & F Copiers, Inc. v. Kroger Co., 391 S.E.2d 711, 713 (Ga. Ct. App. 1990). If a contract is ambiguous, then the court addresses a host of other considerations, such as evidence of surrounding circumstances. Georgia Ass'n of Educators, Inc. v. Paragon Productions, Inc., 520 S.E.2d 37, 39 (Ga. Ct. App. 1999); Harris Corp. v. Giesting

15

& Associates, 297 F.3d 1270, 1274 (11th Cir. 2002).  If the terms of the contract are unambiguous, however, courts interpret it according to its plain meaning. Griffin v. Adams, 334 S.E.2d 42, 44 (Ga. Ct. App. 1985).

Here, we can halt our analysis after the first step because the contract (i.e., the OIC and Collateral Agreement) is unambiguous: neither the plain meaning of the OIC nor the Collateral Agreement permits the Begners to deduct past Collateral Agreement payments.

Undeterred by the contract's plain meaning, the Begners search for ambiguity, arguing that the Collateral Agreement's (Form 2261) definition of "annual income" renders the OIC and Collateral Agreement ambiguous. The Collateral Agreement defines "annual income," in part, as "any payment made under the terms of the offer in compromise (Form 656), as shown in item 2, for the year in which such payment is made."  As stated above, because the IRS used an older version of Form 2261, it incorrectly referenced item 2 instead of item 5 in the revised Form 656 signed by the Begners.  Item 5 of Form 656 reflects the amount to be paid by the Begners in the OIC.  A previous version of Form 656 had required the OIC payment amount be put in item 2.  Item 2 in the revised Form 656 refers to the Begners' social security numbers, a numerical reference that cannot be used to calculate annual income.  The Begners assert that Form 2261's

16

reference to item 2 in Form 656 is meaningless as it references only a social security number (and not a monetary amount). They further argue that in order to give part (b) of Form 2261 any meaning, it should be interpreted to include the deduction of Collateral Agreement payments.

Although the IRS's inadvertent use of an older Form 656 creates confusion, that confusion does not rise to the level of ambiguity—much less suffice to allow the Begners to deduct past Collateral Agreement payments from their annual income. Despite the item-number mix-up, the OIC and Collateral Agreement in their entirety indicate that only the lump-sum payment listed on Form 656 is a permissible deduction under part (b) of Form 2261. The OIC payment can only be deducted under part (b) of Form 2261 if it is paid in the same year as the first Collateral Agreement payment. Because the Begners' first Collateral Agreement payment was due in 1998 for the year 1997, they could not deduct the OIC amount of $130,000 they paid in 1996 from their annual income. As the Collateral Agreement began the year after the IRS accepted the Begners' OIC payment, the $130,000 does not fall within permissible deductions under part (b) of Form 2261.

Resolute in their search for ambiguity, the Begners argue that because the IRS prevented the $130,000 payment deduction, part (b) must be interpreted to include the deduction of Collateral Agreement payments. It does not follow that

17

the Begners—prohibited from deducting the OIC amount explicitly permitted under part (b) of Form 2261 by timing issues—can deduct an alternative amount not specified in any portion of the contract. Form 656 only shows the amount of the lump-sum OIC payment of $130,000 and does not list any of the Collateral Agreement payments. Because part (b) specifies that only payments on Form 656 can be deducted for the purposes of calculating annual income, the lump-sum OIC payment is the only permissible deduction.

So despite the Begners' search for ambiguity, there is none. We could end the opinion here, and it would be complete. Nevertheless, there is one nagging question: if the use of the older version of Form 2261 that mistakenly referenced item 2 instead of item 5 on Form 656 is not ambiguous, then what is it? Stated more simply: if we cannot call the mistake an ambiguity, what do we call it?

Fortunately, the Georgia Supreme Court answered this question in Benedict v. Snead, 519 S.E.2d 905 (Ga. 1999), calling such mistakes clerical, scrivener, or inadvertent errors. In Benedict, the court addressed a contract for the sale of land that contained the phrase "on or before before April 15, 1998" in its time-is-of-the-essence provision. Id. at 906. The purchaser argued that the "before before" error created ambiguity, reasoning "that the contract itself does not provide that the closing date is April 15, but 'on or before before' April 15, and that 'before

18

before' April 15 must be construed as no later than midnight on April 14." Id. The court rejected the argument that this error created ambiguity, holding that "'[a]ny mistake in a contract, consisting of some unintentional act or omission, and manifestly a mere clerical error, in no sense changing the contract or the relations of the parties thereto, is relievable at law." Id. (quoting Gaudling v. Baker, 71 S.E. 1018, 1019 (Ga. Ct. App. 1911)); see also Price v. Age, Ltd., 390 S.E.2d 242, 243 (Ga. Ct. App. 1990) (rejecting the argument that a mis-reference in a contract creates ambiguity, reasoning that "'13.1' is a typographical error for '12.1'"). The Benedict court concluded that such errors do not defeat the clear intentions of the parties when the contract is interpreted in its entirety, and therefore do not render contracts ambiguous. 519 S.E.2d at 906.

Here, the parties contracted with the clear intent of settling the Begners' past-due tax liabilities. The use of an older version of the Form 2261 was not a sufficient error to defeat this intent. Form 2261 references an item line in Form 656 that permits the illogical deduction of a social security number. This reference does not make sense under Form 2261's definition of "annual income." Part (b) of Form 2261 is meant to reference a number listed in Form 656 that could permissibly be deducted in a calculation of annual income like the lump-sum OIC payment made by the Begners. Therefore, Form 2261's reference to the Begners'

19

social security numbers is a clerical error because it cannot be used to calculate an annual income upon which to base future Collateral Agreement payments.

For an example of the difference between a clerical error and an error that creates ambiguity, consider United States v. Hodgekins, 28 F.3d 610 (7th Cir. 1994). In that case, the IRS's mistaken use of the word "interpleader" instead of "implead" in its contract with a taxpayer so fundamentally altered the substantive core of the contract and obscured the intent of the parties that the terms of the contract were construed against the IRS. Id. at 614-15. The mistaken word substitution created contractual ambiguity because it altered the conditions upon which the taxpayer agreed to permit the IRS to reopen the claim. Id.

In contrast to Hodgekins and its intent-modifying mistake, the mistake in this case (i.e., the mis-reference to item 2 instead of item 5) is a mere clerical error that is not so sufficiently misleading as to create ambiguity. Because this clerical error does not affect the legality of the contract or the relationship between the parties, it can be corrected without parol evidence or contract reformation.

In sum, despite the Begners' search for ambiguity, we are left with an unambiguous contract that does not permit the Begners to deduct their Collateral Agreement payments. Accordingly, we reject the Begners' effort to reread the contract to reflect an unexpressed term permitting their deduction of previous

Collateral Agreement payments, because a term cannot be read into a contract where there is no indication that it should be there. Hempel v. United States, 14 F.3d 572, 578 (11th Cir. 1994) (refusing to rewrite a taxpayer's contract with the IRS).

## III.

For the reasons stated above, this Court concludes that the district court did not err in granting the IRS's motion for summary judgment.

AFFIRMED.