[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-12164
_____

D.C. Docket No. 9:16-cv-81719-DMM


INTERNAVES DE MEXICO S.A. DE C.V.,

Plaintiff - Appellee,

versus

ANDROMEDA STEAMSHIP CORPORATION,
AMERICAN NAVIGATION, INC.,
PEGASUS LINES, LTD. S.A., PANAMA,
JAMES KARATHANOS,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(August 1, 2018)

Before MARCUS, FAY, and HULL, Circuit Judges.

MARCUS, Circuit Judge:

This case arises out of a battle over where the parties have agreed to arbitrate this admiralty and maritime dispute. Andromeda Steamship Corporation and Internaves de Mexico s.a. de C.V. entered into a shipping contract (the "Contract") whereby Andromeda agreed to furnish Internaves with a vessel to transport an electric transformer from Brazil to Mexico. Internaves claimed that Andromeda failed to tender the vessel on the agreed-upon date, while Andromeda countered that Internaves never delivered the transformer to the vessel. The Contract unambiguously required the parties to submit their dispute to arbitration. However, the Contract contained conflicting provisions regarding *where* the parties agreed to arbitrate. The district court could not ascertain the site of arbitration from the agreement itself and, therefore, resorted to the statutory default forum, compelling arbitration in its own district -- the Southern District of Florida.

Andromeda appealed, arguing that the district court had erred in proclaiming the Contract hopelessly ambiguous as to the selection of a forum. Had the court waded through the Contract's interpretive tangles, Andromeda says, it would have discovered the parties' mutually agreed-upon intent to arbitrate in London, where it claims the arbitration must be held. Internaves suggests, however, that due to the Contract's murkiness, the district court properly ordered arbitration in Miami.

The Contract hardly represents a model of clarity. Nevertheless, we agree with Andromeda and discern from the document an agreement to arbitrate in

London. Accordingly, we reverse the judgment of the district court and remand with instructions to compel arbitration in London under English law.

## I.

### A.

Andromeda and Internaves entered into the Contract, a charter party agreement, in June 2016. A "charter party" is simply a contractual arrangement whereby a ship owner agrees to lend a ship to a charterer for the transportation of goods from one port to another. *See Hawkspere Shipping Co. v. Intamex, S.A.*, 330 F.3d 225, 228 (4th Cir. 2003); *see also* Soumyadipta Chanda, *A Comparison of Rights and Liabilities Under a Charter Party and a Bill of Lading*, 24 U.S.F. Mar. L.J. 65, 67–68 (2011).

The Contract is divided into two parts. Part I contains terms specific to the parties' particular transaction. Part II includes general boilerplate terms that are typically incorporated into shipping contracts of this kind. Part I includes Box 25, labeled "Law and Arbitration." Box 25 instructs, "[S]tate 19(a), 19(b) or 19(c) of Cl[ause] 19; if 19(c) agreed also state Place of Arbitration (if not filled in 19(a) shall apply)." Clause 19, in turn, also labeled "Law and Arbitration," appears in Part II of the agreement. Clause 19 is divided into sub-clauses 19(a) through 19(d). Affixed to each sub-clause is an asterisk, and the asterisk notation reads, "(a), (b) and (c) are alternatives; indicate alternative agreed in Box 25." Clause 19(a)

3

provides for arbitration in London under English law and imposes additional terms, including a scheme for appointing arbitrators. Clause 19(b) calls for arbitration in New York under U.S. law and prescribes similar supplemental conditions. Clause 19(c) reads this way: "Any dispute arising out of this Charter Party shall be referred to arbitration at the Place indicated in Box 25, subject to the procedures applicable there. The laws of the place indicated in Box 25 shall govern this Charter Party." Finally, 19(d) explains that if Box 25 is not filled in, then 19(a) governs. In sum, Clause 19 of the Contract, located in Part II, provides a list of forum alternatives and instructs the parties to indicate their selection among those alternatives in Box 25. Box 25, located in Part I, also directs the parties to write their selection among Clause 19's options within that space.

Inside Box 25, the parties clearly wrote these words: "London arbitration, English Law." However, in Clause 19, the parties crossed out 19(a), 19(c), and 19(d), leaving only 19(b) -- New York arbitration under U.S. law -- unstruck. Thus, while the parties wrote in the words "London arbitration, English Law" in Box 25 in Part I, they signaled some desire to arbitrate in New York under U.S. law in Part II. Finally, above the signature page, the Contract reads, "It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include PART I as well as PART II. In the event of a

4

conflict of conditions, the provisions of Part I *shall* prevail over those of Part II to the extent of such conflict" (the "Conflict Clause") (emphasis added).

B.

In October 2016, Internaves sued Andromeda in the Southern District of Florida for breach of contract, conversion, and fraud. Internaves claimed that, although it prepaid Andromeda, Andromeda failed to tender the vessel on the agreed-upon date, in violation of the Contract. Andromeda moved to compel arbitration of the dispute in London under English law pursuant to the selection the parties made in Part I, Box 25. The district court granted Andromeda's motion in part, compelling arbitration, but concluded that it could not ascertain from the terms of the agreement where the parties had agreed to arbitrate the dispute. The court observed that, because Part I stipulated "London arbitration, English Law," while Part II indicated a contrary agreement to arbitrate any dispute arising from the Contract in New York under U.S. law, the Parts were hopelessly in conflict. The court continued this way: "This conflict is compounded by ambiguities in the very provisions ostensibly designed to resolve internal inconsistencies." Elaborating, the court recognized that, under the Conflict Clause, in the event of conflict, Part I superseded Part II. However, the court also observed that 19(c), "which also provide[d] for the supremacy of Part I," was crossed out. In light of that puzzle, the district court could not determine whether the Conflict Clause

5

remained applicable to the instant dispute. Accordingly, it held that the parties had failed to provide for a specific arbitral forum and, therefore, it could compel arbitration only within its own district pursuant to 9 U.S.C. § 4.

While Andromeda does not dispute its obligation to arbitrate, it contends that the district court should have compelled arbitration in London, as the parties had written into Box 25.

Andromeda timely appealed to this Court.

## II.

Plainly, the site of arbitration turns on interpretation of the Contract's arbitration clauses, which we review *de novo*. *Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1350 (11th Cir. 2014) ("This Court reviews *de novo* questions of law, such as a district court's interpretation of an agreement to arbitrate . . . ."). After thorough review, we hold that, despite the Contract's apparent conflict about choice of forum, under the Conflict Clause, the parties provided for arbitration in London, under English law, and the district court should have upheld the parties' forum selection under 9 U.S.C. § 206.

## A.

Issues arising out of arbitration agreements are generally resolved by contract-law principles, pursuant to which we attempt to ascertain the parties' intent through the words they use. The Federal Arbitration Act (FAA) provides that

6

written arbitration agreements in "any maritime transaction" "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "This provision reflects both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *Inetianbor*, 768 F.3d at 1349 (quotation omitted and alteration adopted). "In line with these principles, courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." *Id*. (quotation omitted); *see also Am. Express Co. v. Italian Colors Rest*., 570 U.S. 228, 233 (2013) ("[The FAA] reflects the overarching principle that arbitration is a matter of contract. And consistent with [its] text, courts must rigorously enforce arbitration agreements according to their terms . . . ." (quotations and citation omitted)).

International arbitration agreements are governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, commonly known as the "New York Convention," which the United Nations Economic and Social Council adopted in 1958. *Lindo v. NCL (Bahamas), Ltd.*, 652 F.3d 1257, 1262 (11th Cir. 2011). In 1970, the United States joined, by treaty, the New York Convention. 21 U.S.T. 2517; *see also Lindo*, 652 F.3d at 1262. Thereafter, Congress implemented the New York Convention into the United States Code as Chapter 2 of the Federal Arbitration Act, 9 U.S.C. § 201 *et seq*., thereby

supplementing the original codification of the FAA contained in Chapter 1. The New York Convention requires that courts, *inter alia*, recognize written arbitration agreements and uphold freely negotiated forum-selection provisions. *Lindo*, 652 F.3d at 1262, 1266; *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985). Specifically, under Chapter 2 of the FAA, courts "may direct that arbitration be held in accordance with the [arbitration] agreement at any place therein provided for, whether that place is within or without the United States." 9 U.S.C. § 206. By contrast, under Chapter 1, courts may compel arbitration only within their own districts. 9 U.S.C. § 4. Chapter 2 also applies Chapter 1 to all actions arising under Chapter 2 to the extent that the two Chapters do not conflict. 9 U.S.C. § 208. Therefore, if the parties to an international arbitration agreement "provided for" a forum, Chapter 2 establishes a "strong presumption" in favor of compelling arbitration in that forum. *Mitsubishi Motors Corp.*, 473 U.S. at 631. However, if the parties agreed to arbitrate, but failed to "provide[ ] for" a forum, then the court must compel arbitration, but only within its own district pursuant to the provisions found in Chapter 1. 9 U.S.C. § 4 ("The hearing and proceedings, under [an arbitration] agreement, shall be within the district in which the petition for an order directing such arbitration is filed."); *see also Jain v. de Mere*, 51 F.3d 686, 690 (7th Cir. 1995) ("[9 U.S.C.] § 4 not only permits but requires a court to compel arbitration in its own district when no other forum is specified.").

Notably, "[w]hen a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation." *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 22–23 (2004). Specifically, our interpretation of maritime contracts sounds in federal common law, so we look to the general common law of contracts. *See AIG Centennial Ins. Co. v. O'Neill*, 782 F.3d 1296, 1302 (11th Cir. 2015); *Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 932–33 (11th Cir. 2013); *Begner v. United States*, 428 F.3d 998, 1005 (11th Cir. 2005).

Five general principles of contract interpretation apply here. First, "[i]t is well settled that the actual language used in the contract is the best evidence of the intent of the parties and, thus, the plain meaning of that language controls." *Rose v. M/V "GULF STREAM FALCON"*, 186 F.3d 1345, 1350 (11th Cir. 1999). Additionally, "a [contract] should be read to give effect to all its provisions and to render them consistent with each other." *In re FFS Data, Inc.*, 776 F.3d 1299, 1305 (11th Cir. 2015) (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995)). Moreover, if contractual provisions conflict, but, significantly, the contract itself provides means for reconciling the conflict, we are obliged to apply the contract's internal conflict-resolution mechanism. *See Columbia Cas. Co. v. S. Flapjacks, Inc.*, 868 F.2d 1217, 1221 n.1 (11th Cir. 1989). Indeed, where a contract contains a conflict, but also includes a clause that expressly resolves the conflict,

9

"there is no ambiguity." *Lathem v. Sentry Ins.*, 845 F.2d 914, 916–17 (11th Cir. 1988). Further, "[w]hen general propositions in a contract are qualified by the specific provisions, the rule of construction is that the specific provisions in the agreement control." *Goldberg v. Bear, Stearns & Co.*, 912 F.2d 1418, 1421 (11th Cir. 1990). Finally, contracts must be interpreted with sensitivity to the reality that parties occasionally err or misprint in the course of contract drafting. *See Georgia R.R. Bank & Tr. Co. v. Fed. Deposit Ins. Corp.*, 758 F.2d 1548, 1551 (11th Cir. 1985) ("However unskillfully prepared a particular instrument or agreement may be, the courts are to discover and give effect to the intent of the parties if possible."); *see also Begner*, 428 F.3d at 1006 (noting that an apparent contractual error did not render the contract ambiguous).

Thus, when interpreting an international arbitration agreement, we ascertain the parties' intent through plain contractual language; we work to interpret the contract harmoniously to avoid conflict and give meaning to all of the provisions; we are obliged to apply any contractual clauses designed to resolve intra-contractual conflicts; we favor the specific terms over the more general language; and we strive to give the contract coherent meaning if we can, rather than capitulate in the face of apparent ambiguity.

10

B.

As we see it, application of these principles yields the conclusion that the parties agreed to arbitrate their dispute in London. The Conflict Clause unambiguously establishes the superiority of Part I's enumeration of "London arbitration, English Law" over Part II's manifestation of the parties' preference for a New York forum. Moreover, Box 25's heading and instructions, coupled with Clause 19's asterisks, render Box 25 the Contract's authoritative forum-selection clause. Insertion of the written words "London arbitration, English Law" within that provision further evinces the parties' intent to arbitrate in London. The parties specifically wrote "London arbitration, English Law" into the Contract, whereas any indication of the parties' willingness to arbitrate in New York appears only among boilerplate script, and in that regard only by striking a provision with a line. The rule of construction subordinating general terms to specific ones also supports the selection of the London forum.

In Part I, the parties demonstrated their mutual desire to arbitrate in London by writing in their selection of "London arbitration, English Law" in Box 25, labeled "Law and Arbitration." In Part II, the parties indicated some inclination toward arbitrating in New York by crossing out all of Clause 19's sub-clauses except for 19(b), which, as we have already noted, provides for New York arbitration under U.S. law. Plainly, by choosing different arbitral forums in Parts I

11

and II -- by writing in "London" in Part I and leaving 19(b) operative in Part II -- the parties created an inter-Part conflict. Yet these parties anticipated and sought to resolve any such conflict by including a Conflict Clause, which, again, reads this way: "In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict." When parties author conflicting contractual provisions, but expressly provide for a contractual mechanism to resolve any conflict, we are bound by the mechanism they have chosen. *See Columbia Cas.*, 868 F.2d at 1221 n.1; *Lathem*, 845 F.3d at 916–17. Thus, under the Conflict Clause, Part I's designation "London arbitration, English Law" necessarily prevails over Part II.

Additionally, Box 25's heading and instructions, along with Clause 19's asterisks, militate in favor of London arbitration. Box 25, labeled "Law and Arbitration," instructs, "[S]tate 19(a), 19(b) or 19(c) of Cl. 19; if 19(c) agreed also state Place of Arbitration (if not filled in 19(a) shall apply)." Turning to Clause 19, also labeled "Law and Arbitration," an asterisk appears alongside sub-clauses 19(a) through 19(d), and the asterisk notation explains, "(a), (b), and (c) are alternatives; indicate alternative agreed in Box 25." The parties have designated in the Contract that Box 25 is the authoritative space within which to ascertain their forum selection. And inside that space, the parties wrote their preference. Box 25's "London arbitration, English Law" supersedes Clause 19's indication of their

12

preference of a forum. It is true that the parties neglected to stipulate one of "19(a)," "19(b)," or "19(c)" in Box 25, as the Contract had instructed. Nonetheless, the parties' omission essentially amounts to a small error that cannot undermine their manifest intent, as they wrote it, to arbitrate in London under English law. *See Georgia R.R. Bank & Tr. Co.*, 758 F.2d at 1551; *see also Begner*, 428 F.3d at 999–1000, 1006.

The canon of contract interpretation elevating specific terms over the more general ones also supports the selection of London. The parties' particular insertion of "London arbitration, English Law" prevails over the crossed-out boilerplate terms. *See United States v. Pielago*, 135 F.3d 703, 710 (11th Cir. 1998); *Faez v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1106 n.4 (11th Cir. 2014); *McKinney Drilling Co. v. Collins Co.*, 701 F.2d 132, 135 (11th Cir. 1983). Internaves argues, nevertheless, that the specific-general canon is inapposite here because the parties also "specifically" crossed out 19(a), 19(c), and 19(d), thereby creating a conflict not between specific and general conditions, but rather between two specific terms. We are unpersuaded. As we see it, the specific written insertion of "London" entailed far greater specificity and particularity -- and constitutes a far more powerful expression of intent -- than striking 19(a), 19(c), and 19(d) from boilerplate script.

13

Internaves advances several additional objections. First, it claims that, by crossing out 19(c), the parties rendered Box 25 ineffective, arguing that "[i]f the parties chose Paragraph 19(c), it would have provided for the selection in [B]ox 25 to prevail over the selection of London or New York. By striking out Paragraph 19(c) of Part II, [Andromeda] affirmatively rejected the effect of any designated forum within Part I and thereby exalted its choice in Part II over Part I and undermined the [Conflict Clause]." The district court agreed, similarly reasoning that, because 19(c) "provide[d] for the supremacy of Part I," having struck 19(c), the parties suggested that the Conflict Clause was inapplicable and Box 25 irrelevant.

Again, 19(c) reads, "Any dispute arising out of this Charter Party shall be referred to arbitration at the Place indicated in Box 25, subject to the procedures applicable there. The laws of the place indicated in Box 25 shall govern this Charter Party." Clause 19(c) does not "provide[ ] for the supremacy of Part I." Rather, what 19(c) does is offer a "write-in" forum option. Since parties to charter party agreements typically choose to arbitrate in London or New York, 19(a) and 19(b) provide shortcuts for selecting those forums. *See* Gu Weixia & Joshua A. Lindenbaum, *The NYPE 93 Arbitration Clause: Where Ends the Open-End?*, 37 J. Mar. L. & Com. 245, 259 (2006) ("The vast majority of charterparties contain arbitration clauses that call for arbitration in London or New York."). However,

14

since an alternative is occasionally preferred, 19(c) permitted the parties to insert a forum of their choosing. Clause 19(c)'s purpose, thus, was not to ensure Part I's primacy, but rather to afford a forum option other than London or New York. Meanwhile, none of the provisions that *do* establish Part I's supremacy are crossed out. The Conflict Clause expressly calls for Part I's terms to prevail over Part II's in the event of conflict. Likewise, Box 25's labeling and Clause 19's asterisk notation instructed the parties to insert their forum selection among Clause 19's alternatives -- 19(a), 19(b), or 19(c) -- in Box 25. Each of those provisions was left intact, thereby rendering Box 25 the superseding and definitive forum-selection clause irrespective of the fact that the parties struck 19(c). Clause 19(c) does not implicate the Contract's inter-Part hierarchy, and striking 19(c) did not undermine either Part I's predominance over Part II or Box 25's status as the Contract's authoritative forum-selection clause.

Internaves also points to *Bauhinia Corp. v. China National Machinery & Equipment Import & Export Corp.*, 819 F.2d 247 (9th Cir. 1987). In *Bauhinia*, the parties entered into an arbitration agreement in which the only language pertaining to forum selection was the following:

> In case an arbitration is necessary and is to be held in Peking, the case in dispute shall then be submitted for arbitration to the Foreign Trade Arbitration Commission of the China Council for the Promotion of International Trade, Peking . . . .

In case the Arbitration is to take place at [BLANK] either party shall appoint one arbitrator, and the arbitrators thus appointed shall nominate a third person as umpire, to form an arbitration committee. . . . .

*Id*. at 248. Because the agreement said nothing more about forum selection, the Ninth Circuit concluded that the agreement was ambiguous: "The clauses d[id] not expressly choose a forum" and "[t]he document lack[ed] any indication what forum the parties intended to select." *Id*. at 249. As a result, it determined, "The record permits only one conclusion, that the parties intended to leave the issue open." *Id*. at 249–50. Because the parties failed to provide for a forum in their agreement, the provisions of 9 U.S.C. § 206 were inapplicable and, pursuant to 9 U.S.C. § 4, the court could compel arbitration only within its own district. *Id*. at 250.

This case is different. Here, rather than providing *no* forum selection, the parties provided *conflicting* forum selections. But here, the parties created a contractual mechanism to resolve any ambiguity or conflict by declaring Part I superior to Part II in the event of conflict, and by designating Box 25 the conclusive forum selection provision. Thus, unlike in *Bauhinia*, in this case the parties provided for an arbitration forum by writing "London arbitration, English Law" in the Contract's superseding and authoritative forum-selection clause.

Finally, Internaves argues for the first time on appeal that the Contract retains some ambiguity because Part I includes an internal inconsistency.

16

Specifically, in Box 22, which is located in Part I and labeled "General Average to be adjusted at (Cl. 12)," the parties wrote "NEW YORK – USA." Clause 12, in turn, labeled "General Average and New Jason Clause," provides that "[g]eneral average shall be adjusted, stated and settled according [to] York-Antwerp rules 1994 or any subsequent modification thereof." Therefore, Internaves reasons, even if the Conflict Clause resolves conflicts between the Parts, the Contract still contains an intractable conflict within Part I itself, between Box 25 (which calls for London arbitration) and Box 22 (which provides for general-average adjustment in New York).

Again, we are unpersuaded. First, Internaves did not raise the argument in the district court, and we need not consider it on appeal. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) ("This Court has repeatedly held that an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court. . . . If we were to regularly address questions -- particularly fact-bound issues -- that district[ ] court[s] never had a chance to examine, we would not only waste our resources, but also deviate from the essential nature, purpose, and competence of an appellate court." (quotation and citations omitted)). To be sure, an appellate court may consider an issue not raised in the district court if it "involves a pure question of law, and if refusal to consider it would result in a miscarriage of justice." *Id*. at 1332 (quoting *Wright v.*

17

*Hanna Steel Corp.*, 270 F.3d 1336, 1342 (11th Cir. 2001). Although the argument raises a pure question of law, *see Inetianbor*, 768 F.3d at 1350, our failure to address it here would hardly create a miscarriage of justice. *See Blue Martini Kendall, LLC v. Miami Dade Cty.*, 816 F.3d 1343, 1349–50 (11th Cir. 2016).

But even if we were to consider the claim for the first time on appeal, it still would not help Internaves. The "ancient maritime doctrine" of general average holds that, if goods are thrown overboard in order to save a ship from impending catastrophe, the passenger who sacrificed his property for the common good is entitled to reimbursement by pro rata contributions from the other passengers onboard. *See Orient Mid-E. Lines, Inc. v. Shipment of Rice on Bd. S.S. Orient Transporter*, 496 F.2d 1032, 1034 (5th Cir. 1974).[1] General-average disputes are often resolved under the York-Antwerp Rules, which were designed to resolve issues stemming from general-average adjustment. *See Eagle Terminal Tankers, Inc. v. Ins. Co. of U.S.S.R.*, 637 F.2d 890, 894 (2d Cir. 1981).

The parties' insertion of "NEW YORK – USA" in Box 22 does not create an inconsistency within Part I. Mindful of our obligation to "give effect to all [the Contract's] provisions," and to discern incompatibility among them only if they cannot be construed harmoniously, we read Part I as requiring general-average

---

[1] "[T]he decisions of the United States Court of Appeals for the Fifth Circuit . . . as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit." *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

adjustment in New York under York-Antwerp Rules pursuant to Box 22, and arbitration of all other disputes in London under English law pursuant to Box 25. *See In re FFS Data, Inc.*, 776 F.3d at 1305; *Pielago*, 135 F.3d at 710; *Merrill Stevens Dry Dock Co. v. M/V YEOCOMICO II*, 329 F.3d 809, 814 (11th Cir. 2003). Indeed, the parties' use of separate Boxes -- one labeled "Law and Arbitration" (Box 25) and the other labeled "General Average to be adjusted at (Cl. 12)" (Box 22) -- strongly suggests that the parties sought to adjust general average in a location distinct from their arbitral forum. Those conditions are entirely compatible, and, as we see it, create no ambiguity. Moreover, this case does not in any way relate to general-average adjustment; the parties must arbitrate in London.

The only remaining question is which terms will govern the parties' arbitration. Recall that sub-clause 19(a) provides for arbitration in London under English law and prescribes supplemental conditions, including arbitration "in accordance with the arbitrations Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force," and rules controlling the appointment of arbitrators. Yet the parties did not write "19(a)" in Box 25. Rather, they wrote only "London arbitration, English Law." "[C]ourts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d

19

Cir. 1999). Thus, we bind the parties only to the terms on which they agreed -- "London arbitration, English Law" -- and do not impose 19(a)'s supplemental conditions. Rather, any terms governing the parties' arbitration that are not stipulated in the Contract must be supplied by English arbitration rules.

In short, because the parties' intention to arbitrate in London is discernible from the very terms they wrote into the Contract, the parties "provided for" a forum, which the district court was obliged to recognize and uphold. Accordingly, we reverse and remand with instructions to compel arbitration in London under English law.

**REVERSED AND REMANDED**