[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-13822

_____

D.C. Docket No. 0:13-cv-60066-JIC

ABRAHAM INETIANBOR,

Plaintiff-Appellee,

versus

CASHCALL, INC.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 2, 2014)

Before MARTIN, Circuit Judge, and RESTANI,[*] Judge, and HINKLE,[**] District
Judge.

_____

[*] Honorable Jane A. Restani, United States Court of International Trade Judge, sitting by
designation.

[**] Honorable Robert L. Hinkle, United States District Judge for the Northern District of Florida,
sitting by designation.

MARTIN, Circuit Judge:

This appeal arises out of a disagreement between Abraham Inetianbor, who borrowed money at a high interest rate, and CashCall, Inc., the servicer of Mr. Inetianbor's loan. Mr. Inetianbor filed a lawsuit against CashCall, which then sought to compel arbitration based on the loan agreement. The District Court ultimately refused to compel arbitration because the arbitration agreement in the loan document contained a forum selection clause that was integral to the agreement, and the specified forum was not available to arbitrate the dispute. CashCall appeals that decision here. After careful review, and with the benefit of oral argument, we affirm.

## I. FACTUAL BACKGROUND

According to Mr. Inetianbor's complaint, he borrowed $2600 from Western Sky Financial, LLC in January 2011. After Mr. Inetianbor paid CashCall—the servicer of his loan—$3252.65 over the course of twelve months, he believed he satisfied his obligations under the loan agreement. CashCall disagreed and sent Mr. Inetianbor a bill the following month, which he refused to pay. Mr. Inetianbor alleges that CashCall then reported the purported default to credit agencies, which caused his credit score to drop significantly. Mr. Inetianbor sued CashCall for defamation and usury violations, as well as a violation of the federal Fair Credit Reporting Act.

2

Early in the litigation, CashCall filed a motion to compel arbitration, pursuant to the terms of the loan agreement. In the loan agreement, Mr. Inetianbor "agree[s] that any Dispute . . . will be resolved by Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement." The loan agreement contains a number of other references to dispute resolution by the Cheyenne River Sioux Tribal Nation (the "Tribe"), rather than in a court.

Initially, the District Court granted CashCall's request to compel arbitration. Mr. Inetianbor attempted to comply with this order, but returned to the District Court once he received a letter from the Tribe explaining that it "does not authorize Arbitration." The District Court agreed with Mr. Inetianbor that the chosen arbitral forum was not available, and decided to entertain the case in federal court in light of its finding that the forum selection clause was integral to the arbitration agreement. Then, the District Court reversed course again and deemed the forum available after CashCall submitted clarification from the Tribe that "Arbitration, as in a contractual agreement, is permissible," even though the tribal court does not involve itself in the arbitration process.

Mr. Inetianbor, as he had after the District Court's first arbitration order, attempted to comply. Eventually, however, he came back to the District Court

3

again with more evidence that the Tribe has nothing to do with the arbitration process. With this new information, the District Court came back to agree with Mr. Inetianbor that the arbitral forum was not available to hear his dispute with CashCall, and so refused to compel arbitration.

CashCall appeals this decision on several grounds. First, CashCall takes issue with our precedent holding that if a forum selection clause is integral to an arbitration agreement, and the forum is unavailable, then arbitration cannot be compelled. Second, CashCall maintains that, even assuming the integral provision rule is good law, it does not operate to preclude arbitration here because the forum selection clause is not integral. Finally, CashCall argues that the District Court erred when it found that the arbitral forum is unavailable. None of these arguments carry the day.

## II. LEGAL BACKGROUND

The Federal Arbitration Act (FAA) provides that a written agreement in any contract to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision "reflect[s] both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." AT&T Mobility LLC v. Concepcion, ___ U.S. ___, ___, 131 S. Ct. 1740, 1745 (2011) (quotation marks and citation omitted). "In line with these principles, courts must place

4

arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." Id. (citations omitted); see also, e.g., Am. Express Co. v. Italian Colors Restaurant, ___ U.S. ___, ___, 133 S. Ct. 2304, 2309 (2013) ("This text reflects the overarching principle that arbitration is a matter of contract. And consistent with that text, courts must rigorously enforce arbitration agreements according to their terms . . . ." (quotation marks and citation omitted)); Rent-A-Center, W., Inc. v. Jackson, 561 U.S. 63, 67, 130 S. Ct. 2772, 2776 (2010) (same).

The FAA includes several provisions to ensure that an arbitration agreement is enforced. Two are relevant here. First, the FAA provides that, when a recalcitrant party refuses to proceed with an arbitration agreement, District Courts "shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4 (emphasis added). The FAA also includes some provisions for what to do if the agreement contains no method for selecting an arbitrator, or if "any party thereto shall fail to avail himself of [a provided] method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy." Id. § 5. In those cases, "upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein." Id. The question this case

5

presents is what to do when the principle that arbitration is a matter of contract comes into conflict with § 5's substitution provision.

This is not the first time this issue has been presented to this Court. We have said that, § 5 notwithstanding, "the failure of the chosen forum preclude[s] arbitration" whenever "the choice of forum is an integral part of the agreement to arbitrate, rather than an ancillary logistical concern." Brown v. ITT Consumer Fin. Corp., 211 F.3d 1217, 1222 (11th Cir. 2000) (quotation marks omitted). This rule is not without controversy. See Green v. U.S. Cash Advance Ill., LLC, 724 F.3d 787, 790–92 (7th Cir. 2013) (criticizing and rejecting the integral provision rule). Nevertheless, it remains the majority rule among Circuit Courts.[1] Most important, of course, is that the integral provision rule remains the law of our Circuit under our strong prior panel precedent rule. See United States v. Hanna, 153 F.3d 1286, 1288 (11th Cir. 1998) (per curiam) ("In this circuit, only the court of appeals sitting en banc, an overriding United States Supreme Court decision, or a change in the statutory law can overrule a previous panel decision."). We must, therefore, apply the rule here.

---

[1] See In re Salomon Inc. S'holder's Derivative Litig. 91 Civ. 5500 (RRP), 68 F.3d 554, 561 (2d Cir. 1995); Khan v. Dell Inc., 669 F.3d 350, 354–57 (3d Cir. 2012); BP Exploration Libya Ltd. v. ExxonMobil Libya Ltd., 689 F.3d 481, 491 n.7 (5th Cir. 2012); Nat'l Iranian Oil Co. v. Ashland Oil Co., 817 F.2d 326, 333–35 (5th Cir. 1987); Reddam v. KPMG LLP, 457 F.3d 1054, 1059–61 (9th Cir. 2006), abrogation on other grounds recognized by Atlantic Nat'l Trust LLC v. Mt. Hawley Ins. Co., 621 F.3d 931, 940 (9th Cir. 2010).

### III. APPLICATION

"This Court reviews de novo questions of law, such as a district court's interpretation of an agreement to arbitrate (and whether it binds the parties to arbitrate), but accepts the district court's findings of fact that are not clearly erroneous." Multi-Fin. Sec. Corp. v. King, 386 F.3d 1364, 1366 (11th Cir. 2004). Applying this standard of review, and bearing in mind the legal background against which we must decide this case, the District Court is due to be affirmed.

### A. Is the Forum Selection Clause Integral?

To decide whether the forum selection clause is integral, we must consider how important the term was to one or both of the parties at the time they entered into the agreement. See In re Salomon, 68 F.3d at 561 (looking to whether the forum selection clause was "central" to the agreement to arbitrate, or "as important a consideration as the agreement to arbitrate itself"); Zechman v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 742 F. Supp. 1359, 1364 (N.D. Ill. 1990) ("Where one term of an arbitration agreement has failed, the decision between substituting a new term for the failed provision and refusing to enforce the agreement altogether turns on the intent of the parties at the time the agreement was executed . . . ." (quotation mark omitted)). To answer this question, we look primarily to the language of the contract. E.g., Rose v. M/V "Gulf Stream Falcon", 186 F.3d 1345, 1350 (11th Cir. 1999) ("It is well settled that the actual language used in the

7

contract is the best evidence of the intent of the parties and, thus, the plain meaning of that language controls."); Nat'l Iranian Oil Co., 817 F.2d at 333 ("Whether the agreement to arbitrate is entire or severable turns on the parties' intent at the time the agreement was executed, as determined from the language of the contract and the surrounding circumstances.").

It is clear that the parties here intended the forum selection clause to be a central part of the agreement to arbitrate, rather than an ancillary logistical provision. Brown, 211 F.3d at 1222. The arbitration clause expressly provides "that any Dispute . . . will be resolved by Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement." (Emphasis added.) The agreement again references arbitration in the Tribal forum in the paragraph concerning the selection of arbitrators. A number of other provisions of the agreement expressly reference the Tribe, including the very first provision of the contract, which explains that the agreement "is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation." In total, the contract references the Tribe in five of its nine paragraphs regarding arbitration. That the designation of the particular forum pervades the arbitration agreement is strong evidence that at least Western Sky, which drafted the contract, and whose majority shareholder is a member of the

8

Tribe, considered arbitration conducted by the Tribe to be an integral aspect of the arbitration agreement.

The cases on which CashCall relies to support a contrary conclusion are inapposite. This case is quite unlike Brown, where this Court applied the integral provision rule but permitted substitution pursuant to § 5. In Brown, the arbitration agreement provided for the procedural rules only, stating that "[A]ny dispute . . . shall be resolved by binding arbitration under the Code of Procedure of" an unavailable arbitration forum. 211 F.3d at 1220. Unlike in Brown, the arbitration agreements we consider here select not just the rules of procedure, but also the arbitral forum. Beyond that, unlike in Brown, here the chosen arbitral forum is referenced throughout the arbitration agreement. As a result, Brown in no way compels us to reach the same outcome here. The cases from other jurisdictions on which CashCall relies are inapposite for the same reasons. Reddam, 457 F.3d at 1057 (interpreting the provision that "Any arbitration . . . shall be determined pursuant to the rules then in effect of the National Association of Securities Dealers"); Khan v. Dell, No. 09-3703 (D.N.J. Aug. 18, 2010), Tab 1: Dell's Online Policies 4, ECF No. 12-3 (referencing the particular forum only once in the operative arbitration agreement).

CashCall relies primarily on Reddam to argue that because the arbitration agreement does not specify that the Tribe would be the exclusive arbitral forum,

9

this is evidence that the forum selection provision is not integral to the agreement to arbitrate. But the Ninth Circuit's reliance on the fact that "there was not even an express statement that the [forum] would be the arbitrator," Reddam, 457 F.3d at 1060, must be understood in the context of the arbitration provision before that Court. Like Brown, Reddam interpreted contract language that adopted the "rules" of a particular forum. Id. at 1057. Whereas the clause at issue in Reddam did not name any forum at all, the clause we interpret here does include an express statement that the Tribe will be the arbitrator. We think that express statement is tantamount to designating the forum as the exclusive arbitral forum, even if the word "exclusive" is not used. As the loan agreement says, the arbitration "shall"— that is, "is required to," Black's Law Dictionary (9th ed. 2009)—be conducted by an authorized representative of the Tribe. See In re Tennyson, 611 F.3d 873, 877 (11th Cir. 2010) ("The word 'shall' is ordinarily the language of command." (quotation marks omitted)).

Neither is Blinco v. Green Tree Servicing LLC, 400 F.3d 1308 (11th Cir. 2005) (per curiam),[2] any help to CashCall. In that case, this Court decided that a number of details about arbitration could be supplied, including the identity of the arbitrator, the location and forum for arbitration, and the allocation of costs between the parties. Id. at 1312–13. However, in Blinco the agreement to arbitrate

---

[2] This case was abrogated on other grounds, as recognized by Lawson v. Life of the South Insurance Co., 648 F.3d 1166, 1171 (11th Cir. 2011).

10

was general, providing that "All disputes . . . shall be resolved by binding arbitration by one arbitrator." Id. at 1310.  Nothing in the agreement said anything at all to place limitations on the arbitration, like specifying a particular forum or particular rules.  Blinco v. Green Tree Servicing LLC, No. 04-00422 (M.D. Fla. July 29, 2004), Def. Mot. to Stay Case and Compel Arbitration 3, ECF No. 3 (reprinting the arbitration clause); see also Schulze & Burch Biscuit Co. v. Tree Top, Inc., 831 F.2d 709, 715–16 (7th Cir. 1987) (permitting a substitute arbitrator to be named where the arbitration agreement clause provided, in its entirety, that "All disputes under this transaction shall be arbitrated in the usual matter" (quotation marks and capitalization in original omitted)).  In the face of such a general arbitration agreement, where the agreement clearly evidences an intent to arbitrate no matter what, it makes sense to fill in the incomplete clauses.

Mr. Inetianbor's arbitration agreement is quite different.  It evidences an intent to have a specific type of arbitration in a particular arbitral forum.  The parties to the agreement we consider here have exercised their right to "structure their arbitration agreements as they see fit," by way of "choos[ing] who will resolve specific disputes" between them.  See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 683, 130 S. Ct. 1758, 1774 (2010) (quotation marks omitted).  "It falls on courts and arbitrators to give effect to these contractual limitations, and when doing so, courts and arbitrators must not lose sight of the

11

purpose of the exercise: to give effect to the intent of the parties." Id. at 684, 130 S. Ct. at 1774–75; see also Doe v. Princess Cruise Lines, Ltd., 657 F.3d 1204, 1214 (11th Cir. 2011) ("Even though there is a presumption in favor of arbitration, the courts are not to twist the language of the contract to achieve a result which is favored by federal policy but contrary to the intent of the parties." (quotation and alteration marks omitted)).  As a result, the only way to enforce the arbitration agreement "in accordance with the terms of the agreement," 9 U.S.C. § 4, is to compel arbitration before an authorized representative of the Tribe, as the integral forum selection provision requires.

Finally, we turn to CashCall's argument that the severability provision is evidence that the parties intended the general agreement to arbitrate to be enforceable even if the limitations contained in the agreement are unenforceable. Two provisions will be severed only "if the performance as to which the agreement is unenforceable is not an essential part of the agreed exchange."  Restatement (Second) of Contracts § 184(1) (emphasis added).  The forum selection provision here is an "essential part" of the arbitration agreement for the same reason it is integral to that agreement.  We look to a case in which we severed an unenforceable provision from an otherwise enforceable arbitration agreement as instructive.  In In re Checking Account Overdraft Litigation MDL No. 2036, 685 F.3d 1269 (11th Cir. 2012), this Court severed an unenforceable cost-and-fee

12

shifting provision from the general agreement to arbitrate. Id. at 1283. We said the provisions in the Multidistrict Litigation contract were severable because the cost-and-fee shifting provision did not "pervade the arbitration agreement." Id. (quotation and alteration marks omitted). Here, by contrast, the selection of the Tribe as the exclusive arbitral forum pervades the entire arbitration agreement, including the paragraph labeled "Agreement to Arbitrate." Based on these facts, we cannot disregard the limiting provision without undermining the express, repeated intent of the parties to arbitrate subject to that limitation. This being the case, the forum selection provisions are not severable from the general agreement to arbitrate, so the severability clause does not aid in our interpretation of how integral the limiting forum selection provision is.

For these reasons, the designation of the Tribe as the arbitral forum is integral to the agreement, so arbitration can only be compelled if that forum is available.

## B. Is the Arbitral Forum Unavailable?

CashCall maintains that the District Court got the availability analysis wrong, for two reasons. First, CashCall argues that the contract should not be interpreted to require involvement of the Tribe. Second, even if Tribal involvement is required, CashCall argues that the District Court's unavailability

13

finding is clearly erroneous.  Neither argument provides a basis for upsetting the District Court's determination.

CashCall's first argument raises an issue of contract interpretation, which we review de novo.  Multi-Fin. Sec. Corp., 386 F.3d at 1366.  We must interpret the agreement "by reading the words of [the] contract in the context of the entire contract and construing the contract to effectuate the parties' intent."  Faez v. Wells Fargo Bank, N.A., 745 F.3d 1098, 1104 (11th Cir. 2014).  When interpreting an arbitration agreement, "due regard must be given to the federal policy favoring arbitration, and ambiguities to the scope of the arbitration clause itself resolved in favor of arbitration."  Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 475–76, 109 S. Ct. 1248, 1254 (1989).  Again, this Court has held that even as we recognize the presumption in favor of arbitration, we will not elevate the federal policy above the intent of the parties, Princess Cruise Lines, 657 F.3d at 1214, as determined by the "objective meaning of the words used," Faez, 745 F.3d at 1104.

We, like the District Court, understand the arbitration agreement to require the Tribe's involvement.  The "Agreement to Arbitrate" clause expressly provides that the arbitration "shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative."  (Emphasis added.)  We can think of no other reasonable interpretation of the provision for arbitration "by" the Tribe before an

14

"authorized representative" of the Tribe than one requiring some direct participation by the Tribe itself. This interpretation of the agreement is bolstered by a number of other references that clarify that Mr. Inetianbor and Western Sky envisioned that the Tribe would be involved in any dispute that arose under the contract. For example, the first paragraph of the agreement says that "This Loan Agreement is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe," and that Mr. Inetianbor "consent[s] to the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court." Thus, the agreement read as a whole clearly communicated to Mr. Inetianbor that, if intervention was necessary to enforce the terms of the contract or resolve disputes, the intervention would be under the authority of the Tribe.

Second, the District Court did not commit clear error when it found that the arbitral forum was unavailable. Mr. Inetianbor presented the District Court with a letter from the Tribe explaining that "the Cheyenne River Sioux Tribe, the governing authority[,] does not authorize Arbitration." The Tribal Elder CashCall initially chose to arbitrate the dispute expressed a similar sentiment in response to Mr. Inetianbor's question about whether the Tribe was aware of the arbitrator selection process, explaining that because "this is a private business deal[, t]he Tribe has nothing to do with any of this business." Finally, the fact that the arbitration clause calls for the arbitration to be conducted according to consumer

15

dispute resolution rules that do not exist supports the conclusion that the Tribe is not involved in private arbitrations.

The clarifying letter from the Tribe explaining that "Arbitration, as in a contractual agreement, is permissible" does not undermine the District Court's finding of unavailability. That parties could, hypothetically, agree to private arbitration without Tribal involvement does not help CashCall here, where the parties' actual agreement was to arbitrate under the auspices of the Tribe. Based on all the evidence that the Tribe does not involve itself in arbitration between private parties at all, the District Court did not clearly err when it found that the selected arbitral forum was unavailable.

## IV. CONCLUSION

In keeping with the FAA's purpose to enforce arbitration agreements according to their terms, we hold CashCall to the terms of the integral forum selection provision included in Mr. Inetianbor's loan agreement. Because the selected forum is unavailable, a substitute arbitrator pursuant to 9 U.S.C. § 5 cannot be appointed under the terms of the contract we consider here. See Brown, 211 F.3d at 1222. We therefore affirm the District Court's order decision not to compel these parties to arbitration.

AFFIRMED.

16

RESTANI, Judge, concurring:

I agree with the majority's conclusion that the arbitral forum was unavailable, for the reasons stated. I also agree that arbitration may not be compelled here, but for different reasons from those relied on by the majority. Here, from the outset Mr. Inetianbor objected to arbitration on numerous grounds, including that the agreement to arbitrate was unconscionable. Although the District Court found that the arbitral forum was unavailable, it neither addressed substitution of a different arbitrator under § 5 of the FAA nor reached Mr. Inetianbor's claim of unconscionability.

Mr. Inetianbor does not ask us specifically to affirm on the grounds that the agreement to arbitrate was unconscionable, but he has repeatedly maintained on appeal that the agreement was a sham. I agree and conclude Congress did not intend for the federal courts to compel arbitration in such circumstances and that we should exercise our discretion to affirm the District Court on this alternate ground. See Lucas v. W. W. Grainger, Inc., 257 F.3d 1249, 1256 (11th Cir. 2001) (holding that in reviewing a district court's decision on a motion for summary judgment *de novo*, the decision can be affirmed "on any ground that finds support in the record," including an alternate ground); Stewart v. Happy Herman's Cheshire Bridge, 117 F.3d 1278, 1286 (11th Cir. 1997) (accepting Appellee's suggestion to affirm on alternative basis); Chamberlain v. United States, 869 F.2d

17

1501, 1501 (11th Cir. 1989) (affirming dismissal of case on alternative ground "which is obvious and readily applied in this case."); Jackson v. Payday Fin., LLC, No. 12-2617, __ F.3d __, 2014 WL 4116804, at *1, *3, *7–9, *13 (7th Cir. Aug. 22, 2014) (invalidating a substantially similar arbitration agreement as unconscionable).

The FAA provides that a written agreement in any contract to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. One such ground for the revocation of a contract or arbitration agreement is unconscionability. See Cmty. State Bank v. Strong, 651 F.3d 1241, 1267 n.28 (11th Cir. 2011) (noting that the Supreme Court's decision in Concepcion "preserved generally applicable contract defenses such as . . . unconscionability" to arbitration agreements (internal quotation marks omitted)); see also Jackson, 2014 WL 4116804 at *1, *3, *7–9, *13 (invalidating a substantially similar arbitration agreement as unconscionable). Under Florida Law, courts must find an arbitration agreement to be both substantively and procedurally unconscionable to invalidate the agreement. See Pendergast v. Sprint Nextel Corp., 592 F.3d 1119, 1134 (11th Cir. 2010).

In Florida, in determining whether an arbitration agreement is procedurally unconscionable, courts look to:

(1) the manner in which the [arbitration agreement] was entered into;
(2) the relative bargaining power of the parties and whether the

18

complaining party had a meaningful choice at the time the [arbitration agreement] was entered into; (3) whether the terms were merely presented on a 'take-it-or-leave-it' basis; and (4) the complaining party's ability and opportunity to understand the disputed terms of the contract.

Id. at 1135.  The "central question" is "whether the consumer has an absence of meaningful choice in whether to accept the contract terms." Id. (citing Belcher v. Kier, 558 So. 2d 1039, 1042 (Fla. Dist. Ct. App. 1990)).

Substantive unconscionability is determined by looking at whether the terms of the agreement are "unreasonable and unfair." Id. at 1139.  "A contract is substantively unconscionable if its terms are so outrageously unfair as to shock the judicial conscience." Bhim v. Rent-A-Center, Inc., 655 F. Supp. 2d 1307, 1313 (S.D. Fl. 2009) (internal quotation marks and citations omitted).

The forum selection provision in the agreement to arbitrate between Mr. Inetianbor and CashCall is both procedurally and substantively unconscionable.  It is procedurally unconscionable, not just because of unequal bargaining power, but because of CashCall's actions Mr. Inetianbor had no ability or opportunity to understand the forum selection clause. See Pendergast, 592 F.3d at 1135.  The record establishes that no set rules or procedures for conducting arbitrations exist within the Tribe.  And the Tribe expressly said that it does not select or approve arbitrators.  When faced with a substantially similar forum selection provision, the Seventh Circuit noted, "it was not possible for the Plaintiffs to ascertain the dispute

19

resolution processes and rules to which they were agreeing." <u>Jackson</u>, 2014 WL 4116804, at *8. Because the processes and rules were non-existent, it was impossible for Mr. Inetianbor to understand the provision of the agreement to arbitrate specifying the Tribe, together with its set of rules, as the arbitral forum. <u>See</u> <u>id.</u> Accordingly, the clause is procedurally unconscionable.

The terms of the agreement to arbitrate are substantively unconscionable because the forum selection clause, written by CashCall, explicitly chose a non-existent arbitral forum and set of rules, with an aura of governmental legitimacy. For essentially the reason stated by the District Court and the majority I also conclude the contract does not permit any tribal member or tribal elder to act as an arbitrator without Tribal approval. The District Court also found, however, that the Tribe did not select or approve arbitrators, that there were no tribal consumer dispute rules, and that there were no procedures for conducting arbitrations under the auspices of the Tribe. Although the District Court here did not go as far as the Court in <u>Jackson</u>, which concluded that "there simply was no prospect of a meaningful and fairly conducted arbitration" and that the forum selection provision was "a sham and an illusion," <u>Jackson</u>, 2014 WL 4116804, at *8 (internal quotation marks omitted), the record before us would compel any factfinder to reach the same result.

20

Substituting an arbitrator under § 5 of the FAA would be an insufficient antidote to the egregious actions of defendant CashCall.  In evaluating a substantially similar agreement, the Seventh Circuit reasoned that because the agreement provided for any hypothetical dispute to be decided under the auspices of "a legitimate governing tribal body" it was unconscionable in that no dispute could be decided under that body.  Id. at *9.  Further, the Seventh Circuit noted that even if the court substituted an arbitrator under §5 of the FAA, it would not cure the agreement's failings because there would be no adequate substitute.  Id. at *9–10.  The Court characterized the contract as

> contain[ing] a very atypical and carefully crafted arbitration clause designed to lull the loan consumer into believing that, although any dispute would be subject to an arbitration proceeding in a distant forum, that proceeding nevertheless would be under the aegis of a public body and conducted under procedural rules approved by that body.

Id. at *10.  Substitution under §5 of the FAA would have left the loan consumer "without a basic protection and essential part of his bargain—the auspices of a public entity of tribal governance."  Id.  Thus, because "[t]he loan consumer[] did not agree to arbitration under any and all circumstances, but only to arbitration under carefully controlled circumstances—circumstances that never existed and for which a substitute cannot be constructed," the agreement was unconscionable.  Id.  The same reasoning applies here.

21

I conclude that the cases addressing whether more typical arbitral provisions are "integral" to the agreement to arbitrate are inapplicable here. Putting aside the issue of when ordinary arbitration terms are integral, particularly where the contract contains a severability clause, I note that in Brown v. ITT Consumer Fin. Corp., 211 F.3d 1217, 1222 (11th Cir. 2000), and its progeny, where arbitration was compelled, the forum became unavailable because circumstances changed during the time between the signing of the arbitration agreement and the time of the dispute. Here, the alleged forum and procedures selected never existed. At the time the parties signed the agreement to arbitrate, the Tribe did not have consumer dispute rules and did not involve itself in private arbitrations. See Jackson, 2014 WL 4116804, at *9–10.

Finally, it would not frustrate the FAA's purpose to refuse to substitute an arbitrator. Although the FAA indicates a policy favoring enforcement of arbitration agreements, its purpose is not to allow parties to make up non-existent forums and rules in an effort to create the façade of a legitimate, reasonable dispute resolution system, especially one conducted by a sovereign entity. See id. at *10. Accordingly, this arbitration agreement cannot be saved by appointing a substitute arbitrator under §5 of the FAA. Therefore I concur.

22