**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2619-17T4

MAYA ITZHAKOV,

    Plaintiff-Respondent,

v.

DAVID SEGAL,

    Defendant-Appellant.

_____

Argued October 24, 2018 – Decided August 28, 2019

Before Judges Koblitz, Ostrer and Currier.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-3022-17.

Shalom D. Stone argued the cause for appellant (Stone Conroy LLC, attorneys; Shalom D. Stone, on the briefs).

Jonathan R. Mehl argued the cause for respondent.

PER CURIAM

    Plaintiff Maya Itzhakov sued defendant David Segal for breach of a 2017 contract (2017 Contract) that she alleged required him to pay her for her interest

in two pharmacies in Lakewood.  Segal contends a religious court should arbitrate the dispute.  Although the 2017 Contract says nothing about arbitration, Segal argues that arbitration provisions in two earlier contracts are valid and cover Itzhakov's claims.

The trial judge denied without prejudice Segal's motion to stay Itzhakov's breach-of-contract suit and to compel arbitration before the Badatz Rabbinical Court of Lakewood.  Citing Atalese v. U.S. Legal Services Group, L.P., 219 N.J. 430 (2014), the trial judge concluded that the provisions upon which Segal relied did not, with sufficient clarity, convey that disputes must be resolved in arbitration and not in a judicial forum.  The judge ordered defendant to file an answer and the parties to conduct plenary discovery.  The judge stated that if defendant could present evidence that the parties understood their agreements to require arbitration and bar judicial resolution, defendant could renew his motion.

Segal appeals, contending that Atalese does not govern the parties' commercial contract; Itzhakov's claims fall within the scope of the arbitration provisions in the parties' earlier contracts; and discovery is unnecessary.  In the alternative, Segal argues that discovery should be limited to the validity and scope of the arbitration agreements.  We agree with Segal's alternative argument and modify the court's order accordingly.

2

At various times, both Itzhakov and Segal held interests in the Refuah and Westgate pharmacies in Lakewood. On November 29, 2015, Itzhakov sold to Segal her twenty-five percent interest in Westgate Pharmacy LLC, which operated the pharmacy by the same name. Written in Hebrew, their agreement obliged Segal to pay Itzhakov $150,000 – $10,000 upon signing; $4000 on January 1, 2016; and $4000 a month for the following thirty-four months.[1] Itzhakov remained responsible for certain costs incurred before the sale, which Segal could deduct from his payments.

The Westgate agreement includes two dispute resolution provisions. The first pertains to issues of contract interpretation. It states, "This document shall be interpreted only and exclusively by the document's drafter, Mr. Yisroel Knopfler, and we accept his interpretation as if it were one hundred valid and credible witnesses." The second pertains to relevant "questions of Jewish law." It states:

> It is hereby agreed between us that any questions of Jewish law that are relevant to this sale and to this document shall be decided by the Lakewood Rabbinical Court, and we are required to do as they decide, and

---

[1] We granted Segal's motion to supplement the record with an English translation of the agreement. Itzhakov has not identified any alleged errors in the translation.

signing this document constitutes an acceptance of everything in the arbitration agreement that the said court regularly uses, and under no circumstances shall any dispute between us come to the civil courts, G-d forbid.

Over five years earlier, Segal acquired a ten-percent interest in Lakewood Pharmacy LLC (Lakewood LLC), which operated the Refuah Pharmacy. Lakewood LLC was then owned by Itzhakov, Dora Yakubov and Isaac Shimunov. Segal acquired his interest in the company by an assignment agreement (Lakewood Assignment), apparently solely from Yakubov's share.

A rider to the assignment consisted of two sections. The first contained various representations of the "Assignor," including that Itzhakov consented to the assignment and waived her "right of first refusal to purchase Assignor's membership interests." The second section – consisting of ten subsections – addressed the LLC's future governance. The subsections covered Segal's option to purchase, with Itzhakov's consent, an additional ten percent interest; terms of Segal's employment by the pharmacy; Yakubov's and Shimunov's agreement to train Segal; Segal's agreement not to compete with Yakubov's or Shimunov's other ventures; members' voting rights; and right of first refusal if Segal decided to sell his interest. Another subsection stated, "All income[] from

sale/income/refinance/otherwise to be disbursed proportionate to ownership interest after first paying all outstanding business expenses."

The eighth subsection, entitled, "Dispute Resolution – Beth Din," stated, "All disputes arising from this transaction shall be decided solely by the Badatz Rabbinical Court of Lakewood . . . in accordance with the standard arbitration agreement of the Rabbinical Court, which is hereby incorporated into this agreement."

In the years that followed, Yakubov and Shimunov divested their remaining interests, leaving Segal and Itzhakov as equal owners of Lakewood LLC. Then, in 2017, Lakewood LLC sold its interest in Refuah Pharmacy and its inventory to third parties.

Itzhakov alleged that she and Segal entered into the 2017 Contract, which governed distribution of the proceeds as well as Segal's outstanding obligations from his purchase of the Westgate pharmacy. The alleged contract begins as if it were the Refuah sale agreement – although the buyers were not signatories. It states:

> AGREEMENT made this 5rd [sic] day of May, 2017 by and between (i) Lakewood Pharmacy LLC d/b/a Refuah Pharmacy, a New Jersey limited liability company . . . (hereinafter referred to as the "Owner"), David Segal, an individual . . . and Maya Itzhakov, an individual . . . and (ii) Refuah RX LLC, a New Jersey limited liability

company . . . (hereinafter referred to as the "Pharmacy"). Agreed to sell above mentioned pharmacy to: Rachel Brach, an individual . . . and Gitel Mann, an individual . . . (Rachel Brach and Gitel Mann are hereinafter collectively referred to as the "Purchaser's Members") . . . for ONE MILLION TWO HUNDRED THOUSAND US DOLLARS ($1,200,000.00). Which is SEVEN HUNDRED THOUSAND US DOLLARS ($700,000.00) for purchase of Pharmacy, and FIVE HUNDRED THOUSAND US DOLLARS ($500,000.00) for Inventory.[2]

The 2017 Contract goes on to address distribution of the proceeds of the sale:

David Segal and Maya Itzhakov are equal partners of 50% each for Lakewood Pharmacy, LLC DBA Refuah Pharmacy . . . agree to receive SIX HUNDRED THOUSAND US DOLLARS ($600,000.00) each during closing. Also as a good will David Segal agrees to give Maya Itzhakov additional TWENTY THOUSAND US DOLLARS ($20,000.00). All three check will be paid in form of CERTIFIED CHECKS made out to MAYA ITZHAKOV $360,000.00 plus another check of $240,000.00, plus $20,000.00; and David for $600,000.00.

Apparently, Segal was still in the process of paying Itzhakov and Yakubov for transfers of interest previously made, as the agreement also states, "David Segal

---

[2] For the reader's convenience, we have removed bold type where it appears in the agreement.

A-2619-17T4

agrees to continue any payments do [sic] to Maya Itzhakov and Dora Yakubov for MAY of 2017, and further if closing takes longer then [sic] expected."

The 2017 Contract also separately states the balance then due from the Westgate sale, and adds that Segal would pay amounts charged to certain credit cards:

> David Segal agrees to pay for Westgate Pharmacy, LLC . . . the balance of $120,000.00 owed to Maya Itzhakov, plus all open Chase Master credit cards in full in amount of EIGHTY TWO THOUSAND SIX HUNDRED SIX US DOLLARS AND SEVENTY NINE CENTS, ($82,606.79) and THIRTY FOUR THOUSAND SEVEN HUNDRED SEVENTEEN US DOLLARS AND SIXTY CENTS ($34,717.60) plus all the interest and extra charges may be prior closing [sic] or after.

Though the contract states that it was signed on May 5, 2017, Segal maintains that only he signed it. He asserts he forwarded it to Itzhakov, who never signed it.[3] The 2017 Contract includes no provision on arbitration or dispute resolution.

In her Superior Court complaint, Itzhakov alleged that the 2017 Contract was binding, and Segal had breached it by failing to make any of the payments due. Segal responded, in support of his motion to stay the contract action and

---

[3] The record before us does not include a fully executed copy of the contract.

A-2619-17T4

to refer the dispute to the Rabbinical Court, that the dispute resolution provisions in the Lakewood Assignment and Westgate Agreement governed.[4]

In denying Segal's motion, the trial judge left open the possibility of referring the matter to the Rabbinical Court if discovery established that the parties understood they were required to arbitrate before that forum and barred from litigating in civil court. However, the court did not limit discovery to the issues of the validity and scope of the arbitration provisions.

This appeal followed.

## II.

Segal contends that the arbitration provisions in the Lakewood Assignment and the Westgate Agreement are valid contractual obligations that cover Itzhakov's claims, notwithstanding that she alleges breach only of the 2017 Contract.

---

[4] In his supporting certification, Segal also addressed the merits of Itzhakov's claim. He alleged the 2017 agreement was not binding because Itzhakov never signed it. He asserted that an attorney for Itzhakov drafted an initial version; Segal made changes to the draft, thus constituting a counter-offer; and Itzhakov never accepted the changes by signing it. Segal also alleged the sale did not yield $1.2 million because Refuah's debts offset sale proceeds, and the inventory was stale and did not sell for $500,000. He contended that Itzhakov's initial proposal required him to guarantee the buyers' payments, but he altered that provision in his revised draft.

A.

We consider first the validity and enforceability of the arbitration agreements. We review that issue de novo, owing no deference to the trial court. Morgan v. Sanford Brown Inst., 225 N.J. 289, 302-03 (2016). "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986) (citation omitted); see also Atalese, 219 N.J. at 441. We apply state contract-law principles, placing arbitration agreements "on an equal footing with other contracts." Morgan, 225 N.J. at 303 (quoting Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 67 (2010)).

Like any contract, an arbitration agreement "must be the product of mutual assent," which "requires that the parties have an understanding of the terms to which they have agreed." Atalese, 219 N.J. at 442 (quoting NAACP of Camden Cty. E. v. Foulke Mgmt., 421 N.J. Super. 404, 424 (App. Div. 2011)). In particular, a contractual waiver of the right to pursue a claim in court must be "clearly and unmistakably established." Id. at 444 (quoting Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A., 168 N.J. 124, 132 (2001)). The waiver provision must "in some general and sufficiently broad way . . .

explain that the plaintiff is giving up her right to bring her claims in court or have a jury resolve the dispute." Id. at 447.

Whether there was mutual assent depends not on the parties' "real intent but [on] the intent expressed or apparent in the writing," Leodori v. CIGNA Corp., 175 N.J. 293, 300 (2003) (quoting Garfinkel, 168 N.J. at 135), considering "the contractual terms, the surrounding circumstances, and the purpose of the contract," Marchak v. Claridge Commons, Inc., 134 N.J. 275, 282 (1993). This is consistent with our long-standing precedent governing contract interpretation in general. See Friedman v. Tappan Dev. Corp., 22 N.J. 523, 531 (1956); see also Nester v. O'Donnell, 301 N.J. Super. 198, 210 (App. Div. 1997) (stating that the meaning of a contract's terms is determined by looking to "the objective manifestations of the parties' intent"). "Evidence of the circumstances is always admissible in aid of the interpretation . . . even when the contract on its face is free from ambiguity." Atl. N. Airlines, Inc. v. Schwimmer, 12 N.J. 293, 301 (1953). Such extrinsic evidence is considered not to vary or contradict the writing but to illuminate it. Id. at 301-02.

In Atalese, the Court invalidated an arbitration agreement in a contract for debt-adjustment services between an individual consumer and a firm. 249 N.J. at 446. The agreement empowered the parties to submit a dispute to an arbitrator

10

whose decision would be final.  Ibid.  The Court focused on the fact that the contract did not explain what arbitration was or how it varied from judicial dispute resolution; nor did the contract clearly and unambiguously state that plaintiff was waiving her right to sue in court.  Ibid.

Segal contends that the rule of Atalese applies only to consumer and employment contracts.  We are unpersuaded.  No doubt, the Court in Atalese focused on consumers.  But the principle that a person must knowingly waive the right to sue in court applies to any contracting party, whatever the contract's purpose.  The "average member of the public" to whom the Court refers may enter into a contract on behalf of his or her business, or to secure a consumer product or service.  See id. at 442.  In either case, the person must understand that arbitration precludes the right to sue.  Ibid.

A party's sophistication may certainly bear on whether he or she knowingly and voluntarily agreed to a contract's terms.  See McMahon v. City of Newark, 195 N.J. 526, 546 (2008) (determining to enforce a contract between "obviously sophisticated parties"); Van Duren v. Rzasa-Ormes, 394 N.J. Super. 254, 265 (App. Div. 2007) (noting that contracting parties were "highly sophisticated businesspeople of relatively equal bargaining position"), aff'd o.b., 195 N.J. 230 (2008).  However, even a sophisticated party, or one represented

by counsel, will not be deemed to waive his or her rights – whether constitutional, statutory, or common-law – without clear and unambiguous language. See Garfinkel, 168 N.J. at 136 (rejecting the suggestion "that the Court should focus predominately on the plaintiff's level of sophistication to ensure that he acted of his own volition," because "the Court must be convinced that he actually intended to waive his statutory rights" through "[a]n unambiguous writing"); see also Dispenziere v. Kushner Cos., 438 N.J. Super. 11, 18-20 (App. Div. 2014).

1.

Applying the foregoing principles, we affirm the trial court's conclusion that, on its face, the Lakewood Assignment does not explain with sufficient clarity that the parties waived their right to sue in civil court by submitting to dispute resolution by the Lakewood Rabbinical Court; nor does it clearly contrast arbitration with litigation. The Lakewood Assignment simply states that "[a]ll disputes arising from this transaction shall be decided solely by the Badatz Rabbinical Court of Lakewood . . . in accordance with the standard arbitration agreement of the Rabbinical Court, which is hereby incorporated into

this agreement."  Yet, there is no evidence that the parties were provided, or understood the terms of that "standard arbitration agreement."[5]

On the other hand, discovery may disclose extrinsic evidence that illuminates the meaning of the arbitration provision.  In particular, in the years since the Lakewood Assignment was executed, the parties may have referred matters to the Rabbinical Court and demonstrated an awareness that resort to a judicial forum was barred.  See Michaels v. Brookchester, Inc., 26 N.J. 379, 388 (1958) (stating that "subsequent conduct of the parties in the performance of the agreement may serve to reveal their original understanding"); see also Restatement (Second) of Contracts § 202 cmt. g (Am. Law Inst. 1981) (stating that "[t]he parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning").  Furthermore, it may conceivably be demonstrated that within the Orthodox Jewish community, a provision that calls for dispute resolution by a Rabbinical Court is clearly understood to preclude resort to civil courts.  See Meshel v. Ohev Sholom Talmud Torah, 869 A.2d 343, 348 (Md. 2005) (noting the view that "under Jewish law disputes between Jews are, to the extent possible, to be decided by other Jews through the mechanism of a Beth Din," or rabbinical court).  The

---

[5] The "standard arbitration agreement" is not included in the record before us.

"vocabulary of a particular place," see Restatement (Second) of Contracts § 202 cmt. f – in this case, the Orthodox Jewish community – may be relevant in interpreting the arbitration provision of the Lakewood Assignment.

2.

The Westgate Agreement does not suffer from the same lack of clarity regarding the waiver of judicial dispute resolution. That agreement obliges the parties to refer to the Rabbinical Court all "questions of Jewish law that are relevant to this sale and to this document" and specifically provides that "under no circumstances shall any dispute between [the parties] come to the civil courts." Consistent with Atalese, this provision clearly and unmistakably conveys that the parties waive resort to a judicial forum to resolve relevant questions of Jewish law.

On the other hand, the reference of interpretative questions to Yisroel Knopfler does not necessarily preclude judicial resolution of disputes implicating such questions. It simply requires the parties to "accept his interpretation" of the language he drafted. Under the agreement, Knopfler's interpretation could be offered before the Rabbinical Court, if it is adjudicating a relevant question of Jewish law, or it could be offered before the civil court, if it is adjudicating some other question. The parties have simply consented to

14

Knopfler's interpretation. That does not make Knopfler an arbitrator. See Capparelli v. Lopatin, ___ N.J. Super. ___, ___ (App. Div. 2019) (slip op. at 29) (concluding that parties' referral of certain issues to their corporation's former counsel for his "final and binding determination" was not an arbitration agreement).

The Westgate Agreement's arbitration clause is problematic, nonetheless. That is because it raises a question of religious doctrine that may render the clause unenforceable by a civil court. Arbitrability under the Westgate Agreement depends on a finding that the dispute raises "questions of Jewish law that are relevant to this sale and to this document."

"[T]the law presumes that a court, not an arbitrator, decides any issue concerning arbitrability," unless there is "clea[r] and unmistakabl[e]" contrary evidence. Morgan, 225 N.J. at 304 (citation omitted). As the agreement did not expressly assign to the Rabbinical Court the task of determining what qualifies as an issue of Jewish law – as distinct from the task of resolving such issues – it is the court's presumptive responsibility to decide whether an issue is arbitrable.

However, defining what constitutes an issue of Jewish law must be decided according to "neutral principles," that is, objective secular principles that do not require a court to intrude into religious questions. See Elmora

A-2619-17T4

Hebrew Ctr, Inc. v. Fishman, 125 N.J. 404, 414-15 (1991) (stating that a court may resolve a dispute involving an ecclesiastical body by applying neutral, but not religious, principles); Meshel, 869 A.2d at 354, 363 (compelling arbitration by rabbinical court, consistent with neutral principles, where synagogue's bylaws required arbitration of members' claims against the congregation). Deciding what constitutes a "question of Jewish law" would unavoidably entangle the court in religious matters. The only possible means of resolution by neutral principles may be by accepting Knopfler's interpretation of the agreement, including his definition of "questions of Jewish law that are relevant to this sale and to this document."

We cannot decide, on this record, whether hearing from Knopfler will be sufficient to enable the trial court to decide the arbitrability of Westgate-related issues applying neutral principles. As Segal filed his motion in lieu of an answer, we do not know what questions or defenses he may raise relating to Westgate. We know only that he contends the 2017 Contract is not binding at all because Itzhakov did not sign it. It is unclear whether the necessity of a signature raises "a question of Jewish law," or whether Knopfler's interpretation will enable the court to determine that threshold question according to neutral principles.

16

B.

Even if an arbitration agreement is valid and enforceable, the court must ascertain whether a dispute falls within its scope. A court must resolve ambiguities about the scope of an arbitration in favor of arbitration. See, e.g., Lamps Plus, Inc. v. Varela, ___ U.S. ___, ___, 139 S. Ct. 1407, 1418 (2019). The "presumption of arbitrability" applies "only where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand . . . [and] where the presumption is not rebutted." Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 301 (2010). The presumption does not apply until it is determined there is a "validly formed and enforceable arbitration agreement." Ibid.

However, even when the presumption governs, state-law principles of contract interpretation still apply, albeit with "due regard" to pro-arbitration policy. See Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 476 (1989). The presumption does not override the parties' clear intent. Granite Rock Co., 561 U.S. at 301; see also Inetianbor v. CashCall, Inc., 768 F.3d 1346, 1353 (11th Cir. 2014) (stating "the presumption in favor of arbitration" does not override "the intent of the parties as determined by the 'objective meaning of the words used'") (citations omitted).

A-2619-17T4

1.

We turn first to whether enforcement of the 2017 Contract's provisions regarding the Westgate sale (requiring Segal to pay the $120,000 balance plus open credit cards) triggers the Westgate Agreement's arbitration provision. As noted, the 2017 Contract is silent on arbitration. However, an agreement to arbitrate may encompass disputes arising from a subsequent agreement, if the first is worded broadly enough or "the two agreements are merely interrelated contracts in an ongoing series of transactions." Int'l Ambassador Programs, Inc. v. Archexpo, 68 F.3d 337, 340 (9th Cir. 1995). "[W]here a later contract lacking an arbitration clause supplements an earlier 'umbrella' agreement containing such a clause, disputes under the later contract are arbitrable." Cornell Univ. v. UAW Local 2300, 942 F.2d 138, 140 (2d Cir. 1991).

On the other hand, if the agreements are independent of one another, the former's arbitration clause will not control the latter. Int'l Ambassador Programs, 68 F.3d at 340. "Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview." Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc., 252 F.3d 218, 224 (2d Cir. 2001). In addition, "an entirely superseding agreement renders a prior agreement's arbitration clause ineffective, even if the superseding agreement is silent on

arbitration." Dasher v. RBC Bank (USA), 745 F.3d 1111, 1122 (11th Cir. 2014). Whether an agreement is superseding is a question of state contract law, and the presumption of arbitration does not attach to its resolution. Id. at 1120-21.

As pertains to the Westgate transaction, the 2017 Contract may be a novation – an agreement that substitutes for, and discharges, a prior agreement. See Sixteenth Ward Bldg. & Loan Ass'n of Newark v. Reliable Loan, Mortg. & Sec. Co., 125 N.J. Eq. 340, 342 (E. & A. 1939). We recognize that a novation is never presumed and must be a product of the parties' "clear and definite intention." Tolland v. Lista, 46 N.J. Super. 272, 277 (App. Div. 1957). However, the 2017 Contract may have been intended as a complete substitute for the Westgate Agreement and would thus supersede the Westgate arbitration clause. The 2017 Contract appears to extinguish any claims by Segal to offset his obligation with pre-sale costs or for any other breach of the Westgate Agreement. It also addresses an entirely new issue involving credit card bills. Particularly since neither party raised the issue of novation, we remand to the trial court to determine whether the 2017 Contract was intended to supersede the Westgate Agreement.

A-2619-17T4

2.

Turning to the Lakewood Assignment, and assuming for argument's sake that the trial court finds the arbitration clause in that agreement valid based on extrinsic evidence produced in discovery, the court must then decide whether the arbitration clause applies to Itzhakov's claims under the 2017 Contract.

On its face, the language of the Lakewood Assignment is ambiguous, as it is susceptible of two plausible interpretations. See Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am., 195 N.J. 231, 238 (2008) (stating an ambiguity exists when the contractual terms "are susceptible to at least two reasonable alternative interpretations"). The document refers to arbitration issues "arising from this transaction." This may refer only to disputes specifically involving the transfer of Yakubov's interests or Segal's employment – but not a dispute involving the sale of the business after Yakubov no longer had an interest in it. Alternatively, the provision could be more broadly understood to cover any dispute that would not exist but for the assignment – including issues of governance, distributions, and allocation of proceeds to company debts – all of which the agreement addresses.

Because the scope of the clause is ambiguous, we apply the presumption of arbitrability and conclude that the provision's broad wording covers the

parties' dispute over the proceeds of the Refuah sale.  We also note that the provisions regarding the Refuah sale do not appear to be a novation of the Lakewood Assignment.  The provision regarding Refuah simply provided the amount each party would receive from the sale (plus Segal's $20,000 "good will" payment to Itzhakov).  The provision neither referenced nor clearly modified any terms of the Lakewood Assignment, including the priority of allocating proceeds to outstanding debts.

## III.

In sum, the arbitration provision in the Lakewood Assignment on its face does not pass muster under <u>Atalese</u>.  However, discovery may uncover extrinsic evidence of the parties' objective manifestations of intent to waive any resort to a judicial forum, thus satisfying <u>Atalese</u>.  Upon such proofs, the arbitration provision would be valid and enforceable.  Applying the presumption of arbitrability, the Lakewood Assignment's arbitration clause would also cover the parties' dispute over the distribution of the proceeds of the Refuah sale.

The Westgate Agreement's arbitration clause satisfies <u>Atalese</u>.  However, it may enmesh the court in questions of religious doctrine, unless Knopfler's testimony enables the court to apply neutral principles to the question of what issues are arbitrable.  Additionally, the 2017 Contract may be a novation of the

Westgate Agreement and supersede its arbitration clause. Since the determination of a novation is subject to the parties' intention, we remand that issue to the trial court for its initial determination in light of the evidence. If the court finds no novation, it must then determine if Knopfler's interpretation will allow it to construe the arbitration clause using neutral principles. If it cannot do so, the arbitration clause cannot be enforced and Itzhakov's suit, as it relates to Westgate, must proceed in the trial court.

Based on the foregoing analysis, we believe discovery should be limited to the issue of arbitration – namely, the validity of the Lakewood Assignment's arbitration clause and the scope and enforceability of the Westgate arbitration clause. See Guidotti v. Legal Helpers Debt Resolution, L.L.C., 716 F.3d 764, 776 (3d Cir. 2013) (stating that when an agreement to arbitrate is in dispute, the parties should be entitled to limited discovery on that issue, after which "the court may entertain a renewed motion to compel arbitration"). To permit plenary discovery would undermine the parties' agreement – assuming such a valid agreement exists – to avoid judicial dispute resolution.

Affirmed in part, modified in part, and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

22

A-2619-17T4